**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| THE GOODYEAR TIRE & RUBBER COMPANY, | ) |
| | ) |
| | ) |
| *Plaintiff*, | ) Civil Action No. 13-00256 |
| | ) |
| v. | ) |
| | ) |
| TRAVELERS CASUALTY AND SURETY COMPANY (f/k/a AETNA CASUALTY AND SURETY COMPANY), | ) |
| | ) |
| | ) |
| | ) |
| AND | ) |
| | ) |
| TRAVELERS INDEMNITY COMPANY, | ) |
| | ) |
| *Defendants*. | ) |

---

## MEMORANDUM OPINION

**CONTI, Chief District Judge**

### I.     Introduction

The Goodyear Tire & Rubber Company ("Goodyear") sued Travelers Casualty and Surety Company ("Travelers Casualty") and Travelers Indemnity Company ("Travelers Indemnity", and together with Travelers Casualty, "Travelers" or "Defendants") for breach of contract with respect to certain primary liability and umbrella policies. Goodyear seeks damages and declaratory judgments pertaining to Travelers' duties to defend and indemnify Goodyear with respect to certain asbestos-related claims filed against it. (ECF No. 9) Presently pending before the court are cross-motions for "Partial Summary Judgment on Threshold Issues," pursuant to Rule 56 of the Federal Rules of Civil Procedure, filed by Travelers, (ECF No. 92),

and Goodyear, (ECF No. 96). Upon consideration of the parties' submissions and the applicable law, the court finds, as a matter of law, that certain umbrella insurance policies were only clarified by subsequent "No Drop Down" endorsements. The "No Drop Down" endorsements did not modify or change any provision of the relevant umbrella policies and had no effect on Goodyear's right under the umbrella policies to file individual claims which each encompass the covered damages of multiple individuals that arise out of a single occurrence. Goodyear's motion will be granted, and Travelers' motion will be denied.

## II.    Factual Background and Procedural History[1]

The relationship between Travelers as insurer and Goodyear as insured reaches back several decades. Relevant to the present inquiry, Travelers Indemnity issued a series of policies which generally insured Goodyear at the primary level, without interruption, from January 1, 1971, through January 1, 1977. (ECF Nos. 98, ¶¶ 12-15; 20-1). In addition to this primary liability coverage, Travelers Indemnity issued three "catastrophe umbrella policies" ("T-CUPs"), which consecutively provided coverage to Goodyear for certain liabilities in excess of the limits specified by underlying primary policies from July 1, 1973, through July 1, 1980.[2] Goodyear's insurance broker throughout the existence of the T-CUPs was Alexander & Alexander ("A&A"). (ECF No. 94, ¶ 35). During this timeframe, the exposure of individuals to asbestos-containing products either produced by Goodyear or utilized at Goodyear's premises led to a considerable

---

1    The factual background is derived from the undisputed evidence of record and the disputed evidence viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

2    Policy number T-CUP106T3009-73 (the "1973 T-CUP") was in place from July 1, 1973 until July 1, 1976. (ECF Nos. 98, ¶ 2; 20-1). Policy number T-CUP106T3009-76 (the "1976 T-CUP") was in place from July 1, 1976 to July 1, 1979. (ECF Nos. 98, ¶ 3; 20-1). Policy number T-CUP106T3009-79 (the "1979 T-CUP") provided coverage from July 1, 1979 until July 1, 1980. (ECF Nos. 98, ¶ 4; 20-1). The 1979 T-CUP was originally intended to extend until July 1, 1982, but was cancelled as of July 1, 1980. (ECF Nos. 98, ¶¶ 4-5; 20-1).

number of lawsuits being filed against Goodyear for the allegedly resulting injuries of those individuals. (ECF No. 9, ¶¶ 9, 14). The parties dispute the extent to which Travelers must defend or indemnify Goodyear in these suits pursuant to the terms of the T-CUPs and based on their course of conduct, both with respect to the T-CUPs themselves and the underlying primary liability policies.

By their own terms, the T-CUPs are intended

> [t]o indemnify the insured for all sums which the insured shall become obligated to pay by reason of the liability imposed by law upon the insured, or assumed by the insured under any contract, for damages in excess of the retained limit because of bodily injury, personal injury, malpractice injury, advertising injury or property damage to which this policy applies.

(ECF No. 95-2A, at 3). The "retained limit" is defined to be "the greater of (1) the total amount of the applicable limits of liability of any underlying insurance or (2) the deductible amount stated in Item 4 of the declarations." (ECF No. 95-2A, at 10). The 1973 T-CUP identifies as underlying insurance the Travelers policy number TR-NSLO-951700 and any renewals and replacements thereof, which had specified limits for claims related to bodily injury of $300,000 "each person," $1,000,000 "each occurrence," and $6,000,000 "aggregate." (ECF No. 95-2A, at 16). As each of these specified thresholds is higher than the generally applicable deductible of $100,000 specified in Item 4 of the declarations, this deductible was irrelevant to the determination of coverage for asbestos-related damages under the 1973 T-CUP. (ECF No. 95-2A, at 19).[3]

---

3     Item 4 of the declarations in the 1973 T-CUP defines two additional circumstances to which different deductibles are applicable. As each of these deductibles is higher than the specified "each person" and "each occurrence" limits of the underlying policies, the amount of coverage due in these specific circumstances could be impacted. The first of these deductibles applies to "bodily injury by accident or disease or both combined, sustained by any person arising out of and in the course of his employment in Arizona by Goodyear Aerospace," limiting coverage to amounts in excess of $1,015,000. (ECF No. 95-2A, at 18). The second of these deductibles limits

When the 1976 T-CUP went into effect, the limits of the underlying Travelers general liability policy it referenced had increased across the board. (ECF No. 95-2B, at 18). The "each person" limit was increased to $750,000 and the "each occurrence" limit was raised to $1,500,000. Id. The limit for all claims in the aggregate grew to $20,000,000. Id. These "each person" and "each occurrence" coverage attachment points continued to be in effect during the term of the 1979 T-CUP, (ECF No. 95-2C, at 17), although Goodyear's decision to discontinue the underlying Travelers general liability policy and instead to be self-insured for the period beginning January 1, 1977, and ending July 1, 1980, resulted in there being no "aggregate" limit relevant to the 1979 T-CUP. (ECF Nos. 104, ¶¶ 21-22; 95-2C, at 16). Deductibles under the 1976 and 1979 T-CUPs continued to be of no consequence to the determination of coverage for asbestos-related suits because the amounts of the relevant deductibles never exceeded underlying coverage limits. (ECF Nos. 95-2B, at 21; 95-2C, at 15).

All three of the T-CUPs were, at least in part, based on Travelers' umbrella form No. I-4815-2 8-73 (the "Specimen Form"). (ECF Nos. 104, ¶ 7; 94, ¶ 19). The parties disagree about both the degree to which the T-CUPs deviated from the Specimen Form and the extent to which Goodyear was responsible for those deviations. Goodyear asserts that the T-CUPs were written by Travelers based largely on language in the Specimen Form. (ECF No. 104, ¶ 7). Travelers counters by arguing that Goodyear "communicated specific demands regarding its insurance program, and obtained tailored policies in response to these demands," (ECF No. 94, ¶ 85), and that the T-CUPs "were customized to meet Goodyear's specific insurance needs," (ECF No. 94, ¶ 17).

---

liability arising out of the loss of use of a completed aircraft to amounts exceeding $500,000. Id. Neither party argues that either of these deductibles is relevant here.

One of the ways that the T-CUPs differ from the Specimen Form is in their respective "Maintenance of Underlying Insurance" ("MOUI") clauses. This clause, condition number 3 in both the 1973 and 1976 T-CUPs, provides that

> [i]t is a condition precedent to liability of [Travelers] under this policy that [Goodyear] shall maintain in full effect during the policy period all the underlying insurance policies described in the declarations (or renewals or replacements thereof) without reduction of coverage or limits. Failure of [Goodyear] to comply with the foregoing shall not invalidate this policy but in the event of such failure [Travelers] shall be liable hereunder only to the extent that it would have been liable had [Goodyear] complied therewith.

(ECF Nos. 95-2A, at 12; 95-2B, at 14).[4] While this paragraph is substantively identical between the Specimen Form and the T-CUPs, the Specimen Form's MOUI clause contained a second paragraph that was omitted from the T-CUPs. This second paragraph provides that

> [i]n any event of reduction or exhaustion of any aggregate limit of liability stated in the underlying policy solely by payment of losses, such insurance as is afforded by this policy shall apply in excess of the reduced underlying limit or as primary insurance, if such underlying limit is exhausted, and the deductible amount stated in Item 6 of the declarations shall not apply to such insurance.

(ECF No. 95-7, at 8). The parties agree that this second paragraph would have the effect of causing an umbrella policy to "drop down," i.e., begin paying claims as if it was primary insurance in the event that the underlying insurance is reduced or exhausted. (ECF Nos. 93, at 7; 118, at 6). Each of the two umbrella policies in place for Goodyear prior to Travelers issuing the 1973 T-CUP, like the relevant umbrella policies, also did not "drop down." (ECF Nos. 95-11, at 11; 95-12, at 28).

In early 1978, although the T-CUPs did not contain language that would require them to provide "drop down" coverage, certain reinsurers of the T-CUPs expressed concerns that the

---

4       Condition number 3 in the 1979 T-CUP also contains all the quoted text verbatim, with additional language concerning coverage in the event that underlying insurance is exhausted. (ECF No. 95-2C, at 11).

language was not clear enough on this point. (ECF Nos. 94, ¶ 48; 95-9, at 1). In a letter sent on May 5, 1978, Robert Carroll ("Carroll"), the lead Travelers underwriter on the Goodyear account, explained to William Greening ("Greening") of A&A that, although he believed an endorsement "specifically stating there is no drop down on exhaustion of aggregate" was unnecessary, Travelers would "be happy to review any suggested wording that will make the reinsurers more comfortable." (ECF No. 95-9, at 1). Following these discussions, Travelers issued a responsive endorsement (the "No Drop Down Endorsement") to the 1973 T-CUP on November 15, 1978. (ECF No. 94, ¶ 52). On November 20, 1978, the No Drop Down Endorsement was issued to similarly affect the 1976 T-CUP. (ECF No. 94, ¶ 54). Because the 1979 T-CUP had yet to issue at this point, no such endorsement was necessary, and instead its condition number 3 was directly altered to reflect the language of the No Drop Down Endorsement. (ECF No. 94, ¶ 65).

The text of the No Drop Down Endorsement is as follows:

UNDERLYING AGGREGATE LIMIT
NO "DROP DOWN"
THIS ENDORSEMENT IS ISSUED TO CLARIFY THE INTENT OF
CONDITION 3. MAINTENANCE OF UNDERLYING INSURANCE AS
FOUND IN THIS POLICY.
SUBJECT TO ALL THE PROVISIONS OF THIS POLICY, SUCH
CONDITION IS DEEMED TO PROVIDE THAT THE UNDERLYING
INSURANCE POLICIES, INCLUDING RENEWALS OR REPLACEMENTS
THEREOF, WILL REMAIN IN FULL EFFECT, WITHOUT REDUCTION OF
COVERAGE OR LIMITS, DURING THE POLICY PERIOD, PROVIDED
THAT WITH RESPECT TO ANY *CLAIMS* PENDING OR MADE AFTER THE
APPLICABLE AGGREGATE LIMIT OF THE UNDERLYING POLICIES HAS
BEEN EXHAUSTED, THIS POLICY APPLIES ONLY TO THE AMOUNT OF
SUCH *CLAIM* WHICH EXCEEDS THE STATED LIMIT OF THE
UNDERLYING POLICIES FOR EACH OCCURRENCE WHETHER SUCH
LIMIT BE CALLED "EACH OCCURRENCE", "EACH PERSON" OR ANY
OTHER LIMIT WHICH WOULD HAVE APPLIED.

(ECF No. 94, ¶ 53) (emphasis added).  For the purposes of this litigation, Goodyear produced copies of the 1973 and 1976 T-CUPs, which include the No Drop Down Endorsement.  (ECF Nos. 105-B5, 105-B6).  The No Drop Down Endorsement provides that, a "claim" may be subject to either the "each person" or the "each occurrence" limit of the T-CUP.  In an effort to distinguish between the two, the T-CUPs' "Limits of Liability" sections explain that "[f]or purposes of determining the limit of [Travelers'] liability and the retained limit, all damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."  (ECF No. 95-2A, at 11).

Despite this language, the parties dispute the way these "claims" mentioned by the No Drop Down Endorsement and elsewhere throughout the T-CUPs have been handled historically between them.  Travelers asserts that it has paid out over $84 million for asbestos products claims under primary liability policies issued to Goodyear between 1961 and 1977.  (ECF No. 94, ¶ 1).  These claims, Travelers says, were submitted and paid separately for each injured individual with each accumulating against the primary policies' higher aggregate limits and were not bundled together and counted against the lower "each occurrence" maximums.  (ECF Nos. 94, ¶ 86; 95-1A, at 1).  Based on Travelers' calculations, because claims were handled in this way, Goodyear was paid between $45.3 million and $81.8 million more through the primary policies in addition to what it would have received if damages were bundled into one claim for "each occurrence."  (ECF No. 142, ¶ 8).  In a somewhat similar situation, Goodyear was one of several manufacturers that dealt with extensive product liability litigation in the late 1970s and early 1980s connected to vehicle wheels it produced using a "multi-piece rim assembly."  (ECF No. 119, ¶¶ 90-92).  Although at least eight of these suits against Goodyear were found to have

"substantial common factual issues," see In re Multi-Piece Rim Products Liability Litigation, 464 F. Supp. 969, 974 (J.P.M.L. 1979), claims resulting from these suits were handled on a claim-by-claim basis and were not bundled or measured collectively against an "each occurrence" limit, (ECF No. 119, ¶¶ 96-97). Goodyear responds to these facts by explaining that, regardless of how Travelers chose to process claims it submitted, pursuant to the terms of the primary policies in place at the time, Goodyear was not required to submit claims related to multiple-claimant occurrences any differently than claims for only one person. (ECF Nos. 119, ¶ 97; 105-B8; 105-B9).

With this factual backdrop, Goodyear filed suit against Travelers and several other insurance companies in 1997. See Goodyear Tire & Rubber Co. v. Hartford Acc. & Indem. Co., No. CIV.A.97-933, 2005 WL 6244202 (W.D. Pa. Apr. 14, 2005). Travelers was excused from that suit after Goodyear and Travelers entered into a Confidential Settlement Agreement on August 31, 2001 (the "2001 Settlement Agreement"), which resolved some, but not all, coverage issues subject to that litigation. (ECF No. 9, ¶¶ 53-4). The 2001 Settlement Agreement specifically provided for the parties' continuing rights to litigate the remaining unresolved issues at any time after August 31, 2011. (ECF No. 9, ¶ 54). Goodyear filed a complaint against Travelers on February 19, 2013, asserting eight total claims unresolved by the 2001 Settlement Agreement. (ECF No. 1, ¶¶ 56-99). In addition to several items not relevant to the instant matter, Goodyear seeks damages due to Travelers' alleged breach of the T-CUPs as well as a declaratory judgment spelling out Travelers' continuing duties under the T-CUPs. (ECF No. 1, ¶¶ 71-75, 94-99). Goodyear filed an amended complaint on February 27, 2013, to include certain pieces of information related to the 2001 Settlement Agreement, which Goodyear was

permitted to add under seal. (ECF No. 9). On March 14, 2013, Travelers filed its "Answer, Affirmative Defenses and Counterclaims." (ECF No. 20). Through the three counterclaims it included, Travelers first seeks a declaratory judgment that it has no duty to indemnify or defend Goodyear under any of its policies. (ECF No. 20, ¶¶ 23-30). Alternatively, Travelers requests both a declaratory order reallocating amounts paid to Goodyear by all insurance companies during the relevant times and the repayment of certain amounts it paid to Goodyear for claims allegedly not covered by its policies. (ECF No. 9, ¶¶ 31-38).

After an unsuccessful attempt at mediation, (ECF No. 34), this court, on November 6, 2013, granted the parties' "Joint Motion Seeking Bifurcated Schedule After Fact Discovery to Facilitate Resolution of Threshold Issues," (ECF No. 40). This "Threshold Issues" phase requires the resolution of the following two questions. First, were "certain T-CUP Policies . . . validly amended to include a 'no-drop-down' endorsement?" Second, what is "the meaning and effect of the 'no-drop-down' endorsement, including without limitation, the meaning and effect of Condition 3 of the T-CUP endorsement?" (ECF No. 40, at 2). On April 25, 2014, the parties cross-filed motions for partial summary judgment with respect to the Threshold Issues phase under seal, each with supporting briefs, concise statements of material facts, and exhibits. (ECF Nos. 92-99). The parties exchanged oppositional briefs to each other's partial summary judgment motions, responsive statements of material fact, and supporting exhibits on May 23, 2014. (ECF Nos. 114-6; 118-20). Replies in support of each party's own partial summary judgment motion were filed on June 20, 2014, and were accompanied by replies to each other's responsive statement of material facts along with supportive exhibits. (ECF Nos. 137-42). Finally, Travelers submitted a "Notice of Supplemental Authority" on September 5,

2014, (ECF No. 154), to which Goodyear filed a response on September 11, 2014, (ECF No. 155). The parties agree that Ohio law governs this dispute. (ECF No. 104, ¶ 102).

## III. Standard of Review

"The standard for granting summary judgment in a declaratory judgment action is the same as for any other type of relief." Transguard Ins. Co. of Am. v. Hinchey, 464 F. Supp. 2d 425, 429 (M.D. Pa. 2006) (citing Cloverland–Green Spring Dairies, Inc. v. Pa. Milk Marketing Board, 298 F.3d 201, 210 n. 12 (3d Cir. 2002)). Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment**. A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
>
> . . . .
>
> **(c) Procedures.**
>
> **(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(a), (c)(1)(A), (B). The Third Circuit Court of Appeals has stated:

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable fact-finder could return a verdict for the nonmoving party. Anderson, 477 U.S. at 248; see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.") (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322–23).

> [W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine dispute' for trial.

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)). The court must rely on the substantive law to identify which facts are material. Abington Friends Sch., 480 F.3d at 256 (citing Anderson, 477 U.S. at 248).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party, and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, PA, 242 F.3d 437, 446 (3d Cir. 2001); see Woodside v. Sch. Dist of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility

determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n. 3 (3d Cir. 1998).

In a case where no facts are contested and what lies before the court are entirely legal questions, summary judgment on all contested issues is appropriate. Methode Electronics, Inc. v. Elco Corp., 385 F.2d 138, 139 (3d Cir. 1967) (summary judgment "is appropriate when . . . only legal questions are to be resolved"). Under Ohio law, the interpretation of an insurance policy is a matter of law that may be properly resolved at summary judgment. Lager v. Miller-Gonzalez, 896 N.E.2d 666, 669 (Ohio 2008) ("An insurance policy is a contract whose interpretation is a matter of law.").

**IV.     Discussion**

The cross-motions for partial summary judgment require the court to determine whether there is a genuine dispute with respect to any material fact regarding two Threshold Issues. (ECF No. 40, at 2). First, were the T-CUPs validly amended by the No Drop Down Endorsement? Id. Second, what is the meaning and effect of this endorsement in conjunction with Condition 3 of the T-CUPs? Id. Because the answer to the second question will necessarily impact the analysis of the first, these questions will be addressed in reverse order.

**A.   The Meaning and Effect of the No Drop Down Endorsement and Condition 3 of the T-CUPs**

To interpret the T-CUPs, it is important to remember that "[a]n insurance policy is a contract, and the role of the court when asked to interpret the terms of any contract is to give effect to the intention of the parties. We examine the contract as a whole, presuming that the parties' intent is reflected in the policy language." Westfield Ins. Co. v. Factfinder Mktg. Research, Inc., 860 N.E.2d 145, 150 (Ohio Ct. App. 2006). "If a contract is clear and

unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio, Inc., 474 N.E.2d 271, 272 (Ohio 1984). Extrinsic evidence of the parties' intentions is considered "only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." Kelly v. Med. Life Ins. Co., 509 N.E.2d 411, 413 (Ohio 1987). "Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." Savedoff v. Access Grp., Inc., 524 F.3d 754, 763 (6th Cir. 2008). Here, even considering the No Drop Down Endorsements, the T-CUPs clearly and unambiguously provide coverage for amounts in excess of the specified "each occurrence" limit of claims by Goodyear, which encompass multiple individuals whose damages arise out of continuous or repeated exposure to substantially the same general conditions.

### 1. Even Considering the No Drop Down Endorsement, T-CUP Coverage of Claims for Bodily Harm to Multiple Individuals Arising Out of the Same Occurrence is Unchanged

Prior to the addition of the No Drop Down Endorsement, the T-CUPs provided coverage to Goodyear "for damages in excess of the retained limit because of bodily injury." (ECF No. 95-2A, at 3). "Bodily injury" is specifically defined to mean, "bodily injury, sickness or disease, shock or mental anguish sustained by any person, other than malpractice injury." (ECF No. 95-2A, at 9). The specific bodily injuries at issue here, those resulting from exposure to asbestos, are in no way addressed by any of the T-CUPs' specific exclusions from coverage. (ECF No. 95-2A, at 3-7). The T-CUPs define the "retained limit," which is the starting or attachment point of their coverage, as "the total amount of the applicable limits of liability of any underlying

insurance."[5]  (ECF No. 95-2A, at 11).  Under the 1973 T-CUP, the applicable limits of the underlying insurance for bodily injury were "$300,000 each person," "$1,000,000 each occurrence," and "6,000,000 aggregate."  (ECF No. 95-2A, at 16).  These limits increased under the 1976 T-CUP to "$750,000 each person," "$1,500,000 each occurrence," and "$20,000,000 aggregate."  (ECF No. 95-2B, at 18).  The "each person" and "each occurrence" limits of the 1976 T-CUP remained unchanged through the 1979 T-CUP.  (ECF No. 95-2C, at 16).[6]

To determine whether the "each person" or "each occurrence" limit marks the appropriate attachment point of coverage for a given claim, the T-CUPs explain that "all damages arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."  (ECF No. 95-2A, at 11).  This court ruled previously, concerning nearly identical insurance policy definitions of "one occurrence," that Goodyear's liabilities related to its production of asbestos-containing products arise out of one occurrence.  See Goodyear Tire & Rubber Co., 2005 WL 6244202, at *9.[7]  When construing a contract "we must attempt to give effect to each and every part of it, . . . and avoid any interpretation of one part which will annul another part."  Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth., 678 N.E.2d 519, 527 (Ohio 1997).  Any interpretation of the T-CUPs which concludes that every individual's injuries related to asbestos-containing products must be claimed separately by Goodyear would render the T-CUPs' "each

_____

5       The "retained limit" could also be the deductibles defined elsewhere within the T-CUPs if they are greater than the applicable limit of the underlying insurance.  Here, however, the deductible for damages related to bodily injury from asbestos exposure is either lower than or equal to the applicable limits of the underlying insurance, and is therefore of no consequence.  (ECF Nos. 95-2A, at 19; 95-2B, at 56; 95-2C, at 25).

6       There was no aggregate limit specified by this policy because Goodyear was self-insured at the primary level when the 1979 T-CUP was issued.  (ECF No. 98, ¶ 22).

7       There is a separate question about whether all asbestos-related liabilities arise out of a single occurrence or instead multiple liabilities related to specific asbestos-containing products or Goodyear facilities are separate single occurrences.  This question is not yet properly before the court in this Threshold Issues phase and will be dealt with at a later time.

14

occurrence" limit and definition of "one occurrence" meaningless. The only reasonable interpretation of the T-CUPs is that the parties intended claims encompassing damages to multiple people, but arising out of continuous or repeated exposure to substantially the same general conditions, to be measured cumulatively against the "each occurrence" limit.

This interpretation does not change the fact that the T-CUPs only provide coverage for such a claim to the extent that it exceeds the "each occurrence" limit of the underlying insurance. As Travelers argued extensively throughout this stage of the litigation, the T-CUPs are umbrella policies which were drafted so that they do not "drop down" and immediately begin paying claims as if they were primary policies in the event that the underlying primary policy is exhausted or discontinued. (ECF No. 93, at 7). The T-CUPs themselves clearly demonstrate that it was the parties' intention not to have the umbrella policies "drop down." The MOUI clauses within the T-CUPs plainly require Goodyear to maintain the underlying primary liability insurance described in the declarations "without reduction of coverage or limits," stating that, if Goodyear fails to do so, Travelers "shall be liable hereunder only to the extent that it would have been had [Goodyear] complied therewith." (ECF No. 95-2A, at 12). This clause's import is that payment of a claim by the T-CUPs is only triggered when the dollar amount of a claim, whether it is for one person or multiple people, exceeds the relevant "each person" or "each occurrence" limit of the underlying insurance. Further, the T-CUPs only provide coverage for that claim to the extent that the dollar amount of the claim exceeds the applicable limit, even when the underlying insurance ceases to provide coverage up to that limit due to exhaustion or discontinuation.

If the MOUI clauses were not clear enough on the point, the intention that the T-CUPs not drop down was further demonstrated by the No Drop Down Endorsement added to the 1973 and 1976 T-CUPs in November of 1978 and integrated into the MOUI clause of the 1979 T-CUP. (ECF No. 94, ¶¶ 52, 54, 65). This endorsement, which was "issued to clarify the intent of condition 3" (the MOUI clause) of the T-CUPs, explains that "with respect to any claims pending or made after the applicable aggregate limit of the underlying policies has been exhausted, [the T-CUPs apply] only to the amount of such claim which exceeds the stated limit of the underlying policies for each occurrence whether such limit be called 'each occurrence', 'each person' or any other limit which would have applied." (ECF No. 95-2A, at 31). Goodyear does not dispute the import of the clarification. (ECF No. 97, at 16). With this clarification, there can be no reasonable question that, based on the clear and unambiguous language of the T-CUPs, the parties intended that a claim by Goodyear, which encompasses the damages of multiple individuals whose bodily injuries arise from exposure to the same condition, would be covered under the T-CUPs, but only to the extent that the dollar amount of the total claim exceeds the "each occurrence" limit of the underlying insurance.[8]

## 2. Travelers' Arguments that a Separate Claim Must be Filed by Goodyear for Each Individual's Asbestos-Related Damages

If Goodyear was required to file an individual claim for each person to whom it was liable for asbestos-related bodily injuries, there could be no recovery under the T-CUPs because no asbestos-related claim has been resolved against Goodyear for more than $1,000,000. (ECF No. 98, ¶ 66). Travelers attempts to support this interpretation of the T-CUPs by making essentially two arguments. First, Travelers asserts that Goodyear's prior course of conduct

---

[8]    The "each occurrence" limit was $1,000,000 under the 1973 T-CUP, (ECF No. 95-2A, at 16), and $1,500,000 under the 1976 and 1979 T-CUPs, (ECF Nos. 95-2B, at 44; 95-2C, at 25).

supports this position. Second, Travelers contends that the clear and unambiguous language of the T-CUPs, read together with the No Drop Down Endorsement, requires this result. As will now be discussed, neither argument is availing.

### a) Goodyear's Prior Course of Conduct

Travelers asserts that a court can reject a policyholder's position when it is contradicted by the parties' actual course of dealing. (ECF No. 93, at 20-21) (relying on <u>Bondex Int'l, Inc. v. Hartford Acc. & Indem. Co.</u>, 667 F.3d 669, 680 (6th Cir. 2011)). To support its argument that Goodyear has done an "about-face" and concocted a new theory of coverage, (ECF No. 140, at 11-12), Travelers asserts the following as facts. First, Travelers alleges that "Goodyear accepted payments for asbestos products claims as separate occurrences subject to the aggregate limits of the underlying Primary Policies, not a one occurrence." (ECF No 93, at 21). Next, Travelers alleges that "Goodyear presented products claims on a claim-by-claim basis without ever bundling other related claims, such as those for defective tire rims, into a single occurrence." <u>Id.</u> Finally, Travelers asserts that Goodyear's return of money to Travelers after the 1973 Primary Policy was exhausted, "rather than insisting that the Umbrella Policies were up to the plate," demonstrates Goodyear's understanding that separate claims were to be filed for each individual's damages. <u>Id.</u>[9] Even accepting these facts as true, there is no genuine issue of material fact as they are insufficient to overcome the clear and unambiguous language of the T-CUPs.

---

9       Throughout its submissions, Travelers offers considerable additional evidence of Goodyear's course of dealing with it. The remainder of this evidence goes to Goodyear's understanding that the T-CUPs do not "drop down," which is a proposition that Goodyear does not dispute. As such, the court will not discuss any remaining course of conduct evidence that is unrelated to Goodyear's understanding of individual versus "each occurrence" claims.

As the court in <u>Bondex</u> noted, "we may consider extrinsic evidence to interpret, but not to contradict, the express language" of a contract. <u>Bondex Int'l, Inc.</u>, 667 F.3d at 680. Extrinsic evidence, however, cannot be considered for even this limited purpose when the plain language of the contract is clear and unambiguous. <u>See</u> <u>Kelly</u>, 509 N.E.2d at 413. Further, "courts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract." <u>Covington v. Lucia</u>, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003). "A contract does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto." <u>Foster Wheeler Enviresponse, Inc.</u>, 678 N.E.2d at 526. Here, the "no drop down" provisions of the T-CUPs are susceptible to only one reasonable interpretation and their meaning can be determined from within their four corners. <u>See</u> <u>Savedoff</u>, 524 F.3d at 763. Because the T-CUPs' provisions in issue are clear and unambiguous, there is no place for the course of dealing evidence offered by Travelers, and the court must instead "apply the terms as written, according to their plain and ordinary meaning." <u>Bondex Int'l, Inc.</u>, 667 F.3d at 677.

### b) Travelers' Interpretation of the No Drop Down Endorsement and the MOUI clause

Travelers reads the No Drop Down Endorsement together with Condition 3 of the T-CUPs to somehow require that Goodyear submit separate claims for each person with asbestos-related damages. Specifically at issue is the use of the word "claim" in the No Drop Down Endorsement, which provides that,

> with respect to any *claims* pending or made after the applicable aggregate limit of the underlying policies has been exhausted, this policy applies only to the amount of *such claim* which exceeds the stated limit of the underlying policies for each occurrence whether such limit be called "each occurrence", "each person" or any other limit which would have applied.

18

(ECF No. 95-2A, at 31) (emphasis added).  Travelers' assertion is that the No Drop Down Endorsement uses the word "claim" to describe a "products claim" which an allegedly injured party would bring against Goodyear and not what Goodyear would file with Travelers for payment of a covered loss under the T-CUPs.  (ECF No. 121, at 21).  With this meaning ascribed to a "claim," Travelers argues that "by the plain terms of the endorsement, [the T-CUPs] respond on a claim-by-claim basis only to the amount of *such claim* which exceeds the *stated limit* of the underlying policies for each occurrence."  (ECF No. 93, at 12) (emphasis in original).  This interpretation, which would greatly alter the coverage otherwise provided by the T-CUPs, is unreasonable based on both the clear purpose of the No Drop Down Endorsement and a reading of it in conjunction with the rest of the T-CUPs' provisions.

> ### i. The No Drop Down Endorsement was Only a Clarification, not a Modification or an Amendment

It is apparent that the parties intended the No Drop Down Endorsement to only clarify the MOUI clauses.  As the No Drop Down Endorsement itself announces, its purpose was "to clarify the intent of Condition 3. Maintenance of Underlying Insurance as found in this policy."  (ECF No. 95-2A, at 31).  This endorsement was issued by Travelers in response to concerns of certain reinsurers which wanted language in the T-CUPs "'specifically stating there is no drop down on exhaustion of aggregate.'"  (ECF No. 93, at 11 (quoting ECF No. 95-9)).  Beyond this stated purpose of clarification, neither party suggested that the No Drop Down Endorsement was intended to modify the T-CUPs in any way.  As Travelers put it, the T-CUPs "operate[] the same way with or without the No Drop Down Endorsement" (ECF No. 93, at 12).  Before reaching the effect of this endorsement which the parties clearly intended would only clarify the rights created

19

by the MOUI clauses, the court will briefly address whether any intended modification through the No Drop Down Endorsement could have been successful given the failure to observe the formalities of contract formation.

If the court was to adopt an interpretation of the No Drop Down Endorsement which limited each claim by Goodyear to only one individual's asbestos-related damages, it would greatly alter the terms of the T-CUPs which existed before the endorsement, as discussed above. Such an "endorsement must be regarded as a modification of the terms of the original contract of insurance if a clear inconsistency appears," Workman v. Republic Mut. Ins. Co., 56 N.E.2d 190, 194 (Ohio 1944), and "[i]t is axiomatic that any modification of a contract must be supported by both mutual consent, and consideration." GenCorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 813-14 (6th Cir. 1999). Neither requirement would be satisfied here. Because neither party offered evidence that the No Drop Down Endorsement was intended to alter the terms of the T-CUPs, Goodyear could not have assented to such an unintended alteration. Even with mutual consent, any purported modification was unsupported by consideration. Travelers does claim that Goodyear benefitted from Travelers' continued provision of umbrella coverage, which saved Goodyear the "headache" of dealing with changes in insurance. (ECF No. 114, at 13). However, to constitute consideration, a benefit must be "bargained for." Carlisle v. T & R Excavating, Inc., 704 N.E.2d 39, 43 (Ohio Ct. App. 1997). "Something is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." Id. Here, there is no evidence that the benefit asserted by Travelers was part of a bargained-for exchange.[10] With none of the required elements of contract formation satisfied

---

10      Travelers asserts that this benefit was provided to Goodyear "in connection with the negotiation of the 1976 Umbrella Policy," (ECF No. 114, at 13), not the No Drop Down Endorsement, which was issued over two years

here, the No Drop Down Endorsement could not have effectively modified or changed the terms of the T-CUPs.

      **ii.**    **When Read in Conjunction with the Remainder of the T-CUPs, Travelers' Interpretation of the No Drop Down Endorsement is Unreasonable**

Even assuming that the No Drop Down Endorsement was an effective modification to the T-CUPs, it could not have the effect argued for by Travelers. To be capable of limiting each asbestos-related claim by Goodyear to only a single individual's damages, the endorsement must be able to be construed as addressing the legal "claims" of allegedly injured persons, not the "claims" that Goodyear as an insured party would make for coverage from Travelers. Courts must consider endorsements a part of an insurance contract for the purposes of contract interpretation. <u>Workman</u>, 56 N.E.2.d at 194. In determining their plain meaning, Ohio law requires insurance contracts, including endorsements, "to be read as a whole and each word given its appropriate meaning, if possible." <u>Whitt Mach., Inc. v. Essex Ins. Co.</u>, 631 F. Supp. 2d 927, 934 (S.D. Ohio 2009). "It is only when a provision in a policy is susceptible of more than one *reasonable* interpretation that an ambiguity exists." <u>Hacker v. Dickman</u>, 661 N.E.2d 1005, 1006 (Ohio 1996) (emphasis added). Applying these principles here, use of the term "claim" throughout the T-CUPs and the No Drop Down Endorsement simply does not support Travelers' interpretation. Even assuming it did, the endorsement could not be reasonably interpreted as a whole to limit coverage in the way Travelers asserts.

Viewing the No Drop Down Endorsement in isolation, the term "claim" appears to be used to refer to the action that Goodyear would take to seek payment from Travelers for a

---

after the 1976 T-CUP was issued. Additionally, there is no evidence that Goodyear sought to secure this advantage through its assent to the endorsement.

liability covered by the T-CUPs.  This endorsement specifically refers to "*claims* pending or made after the applicable aggregate limit of the underlying policies has been exhausted," explaining that "this policy applies only to the amount of such *claim* which exceeds the stated limit of the underlying policies for each occurrence whether such limit be called 'each occurrence', 'each person' or any other limit which would have applied."  (ECF No. 95-2A, at 31) (emphasis added).  This statement would make no sense if the "claim" to which it refers is one brought by an allegedly injured party, because the amount of such a claim that is "pending" or "made" against Goodyear is irrelevant to Travelers' liability under the policy.  Only once this kind of claim has been resolved against Goodyear, either by judgment or settlement, can T-CUP liability be calculated.  This inconsistency vanishes when the No Drop Down Endorsement is construed to be referring to the kind of claim that Goodyear would make to Travelers as its insurer.  Such a claim would be "made" after Goodyear's legal obligation to pay a specific amount was finally determined and would remain "pending" until Travelers paid it.  Despite Travelers' argument to the contrary, (ECF No. 121, at 21), it would be entirely possible for an insurance claim against the T-CUPs to be "made" or exist as "pending" after the aggregate limit of the underlying insurance had been exhausted.

Travelers' interpretation of the word "claim" fares no better when the remainder of the T-CUPs is considered.  Although there is no explicit definition offered in the T-CUPs to explain what a "claim" is, the word appears eight times throughout the T-CUPs apart from its use in the No Drop Down Endorsement.  Six of these eight occurrences refer to "claims or suits" and deal with the parties' obligations regarding an unresolved claim for damages brought against Goodyear.  (ECF No. 95-2A, at 7, 8, 10, 11, 12, 25).  The remaining two uses of the word

"claim" both fall within the "Loss Payable" clause, Condition number 7 of the T-CUPs. (ECF No. 95-2A, at 13). This clause lays out the conditions that must be met in order for "the insured" to "make claim for loss hereunder." Id. Among those conditions, Goodyear must have either paid amounts related to an injured party's covered damages or had its obligation to pay such amounts finally determined by either judgment or written agreement. Id. This requirement directly conflicts with Travelers' interpretation of the No Drop Down Endorsement, which would require the T-CUPs to apply instead to an allegedly injured party's "claim" against Goodyear which has yet to be resolved.

When viewed in this context, it is clear that the word "claim" is used in the No Drop Down Endorsement to refer to the action taken by an insured party to receive coverage under an insurance policy. The T-CUPs do internally discuss "claims" of two different types, but there are clear indications as to which was intended by each use. The endorsement does not refer to "claims or suits" as the T-CUPs otherwise do whenever a claim for damages by an injured person is discussed. (ECF No. 95-2A, at 31). The "Loss Payable" condition, which expressly discusses claims by the insured, also lacks the "or suits" modifier. (ECF No. 95-2A, at 13). Attaching Travelers' asserted meaning to the word "claim" in the No Drop Down Endorsement would result in a direct conflict with the language of the "Loss Payable" condition. Because only one interpretation of the word "claim" as used in the No Drop Down Endorsement is reasonable after reading the T-CUPs as a whole, the court finds no ambiguity in that endorsement.

If there was any ambiguity concerning which meaning of the word "claim" was intended, the No Drop Down Endorsement could still not be *reasonably* interpreted to limit Goodyear to a

single claim for each asbestos-related liability. By its own terms, the No Drop Down Endorsement was specifically issued to clarify that, based on the language of the MOUI clauses, the T-CUPs would not "drop down." (ECF No. 95-2A, at 31). No other purpose or intention for the No Drop Down Endorsement was suggested by either party. The MOUI clause itself only served to stipulate Travelers' liability in the event that the underlying primary insurance was discontinued or exhausted, and did not refer in any way to the manner in which Goodyear could file claims with Travelers or the number of individuals whose damages could make up a single claim. For the No Drop Down Endorsement to have affected the number of individuals for whom Goodyear could seek coverage for damages as part of a single claim under the T-CUPs, one would have to find that this endorsement affected unintended subject matter through an amendment to an unrelated policy provision. This interpretation is not reasonable and does not serve to make the T-CUPs ambiguous. See Hacker, 661 N.E.2d at 1006.

Because the T-CUPs and the No Drop Down Endorsement are clear and unambiguous, their "interpretation is a matter of law and there is no issue of fact to be determined." Inland Refuse Transfer Co., 474 N.E.2d at 272. The court concludes that the MOUI clauses have the effect of limiting Travelers' liability under the T-CUPs such that Travelers is only obligated to pay an amount of any claim in excess of the "each person" or the "each occurrence" limit of the underlying insurance, whichever is applicable, regardless whether that underlying insurance has been discontinued or exhausted; i.e., the T-CUPs do not "drop down." The No Drop Down Endorsement drafted by Travelers makes clear that Travelers understood the MOUI clauses to already contain "no drop down" provisions. The MOUI and the No Drop Down Endorsement DO NOT affect, in any way, the number of individuals for whom Goodyear can seek coverage of

asbestos-related damages as part of a single claim.  The T-CUPs clearly provide that "all damages arising out of continuous and repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence."  (ECF No. 95-2A, at 11).  If Goodyear can show that the covered damages of multiple individuals arise out of one occurrence, all such damages may be included in one claim, and the T-CUPs must provide coverage to the extent that those aggregated damages exceed the applicable "each occurrence" limit.[11]

### B. The T-CUPs Were Only Clarified by, but not Validly Amended to Include, the "No Drop Down" Endorsement

As discussed in section A(2)(b)(i) above, "any modification of a contract must be supported by both mutual consent, and consideration." GenCorp, Inc., 178 F.3d at 813-14. Goodyear argues that there is no evidence it agreed to or even received the No Drop Down Endorsement or that this endorsement was supported by consideration.  (ECF No. 97, at 23-5). Without revisiting this analysis, there does appear to be merit to Goodyear's contention that the existence of mutual consent to a purported modification and bargained-for consideration are unsupported by the evidence.[12]  However, because the No Drop Down Endorsement only serves to clarify the original intent of the parties without altering the legal rights created by the T-CUPs in any way, it is not a modification for which the elements of contract formation must be satisfied.  The lack of any *change* effected on the T-CUPs by the No Drop Down Endorsement means that this endorsement was not actually an amendment at all, and could not have validly *amended* the T-CUPs.

---

11      The "each occurrence" limit was $1,000,000 in the 1973 T-CUP and $1,500,000 in the 1976 and 1978 T-CUPs.  (ECF Nos. 95-2A, at 16; 95-2B, at 18; 95-2C, at 16).
12      See Section A(2)(b)(i), supra.

An endorsement must be treated as a modification to the original insurance contract only if a clear inconsistency appears. <u>Workman</u>, 56 N.E.2d at 194. Here, the No Drop Down Endorsement was only "issued to clarify the intent of Condition 3," (ECF No. 95-2A, at 31), not to change its function. Years before the No Drop Down Endorsement was issued, the language of Condition 3, the MOUI clause, made it clear that the T-CUPs would not "drop down" and provide coverage as a primary insurer in the event that the underlying primary policies were exhausted or ceased to exist. (ECF No. 95-2A, at 12). For this reason, Travelers did not even think this endorsement was necessary. (ECF No. 93, at 11 (citing ECF No. 95-9)). Most importantly, both parties agree that the T-CUPs operate the same way with or without the No Drop Down Endorsement. (ECF No. 93, at 12 (citing ECF No. 95-8, at 7-8)). Because the No Drop Down Endorsement is not alleged to have had an effect on the function of the T-CUPs, there is no inconsistency between them which would require treating the endorsement as a modification. This absence of effect also prevents the endorsement from being considered a valid amendment to the T-CUPs, because, by its definition, an amendment is "a *change* made by addition, deletion, or correction." BLACK'S LAW DICTIONARY 98 (10th ed. 2014) (emphasis added). In light of the endorsement merely clarifying and in no way changing or affecting the function of the T-CUPs, the court holds as a matter of law that the T-CUPs were unchanged – not amended – by the No Drop Down Endorsement.

## V.    Conclusion

For the foregoing reasons, the Motion for Partial Summary Judgment (ECF No. 92) filed on behalf of Travelers will be denied, and the Motion for Partial Summary Judgment (ECF No. 96) filed on behalf of Goodyear will be granted. Concerning Threshold Issue 1, there is no

genuine dispute of any material fact and the court holds as a matter of law that the T-CUPs were unchanged – not amended – by the No Drop Down Endorsement.  With respect to Threshold Issue 2, the court also finds no genuine dispute of any material fact and holds as a matter of law that Condition 3 of the T-CUPs – whether or not the No Drop Down Endorsement is considered – has the meaning and effect of limiting Travelers' liability under the T-CUPs such that Travelers is only obligated to pay an amount of any claim in excess of the "each person" or the "each occurrence" limit of the underlying insurance, whichever applies to a given claim, regardless whether that underlying insurance has been discontinued or exhausted; i.e., the T-CUPs do not "drop down."  As discussed above, the damages of multiple individuals must arise out of continuous or repeated exposure to substantially the same general conditions to be aggregated in a single claim against the "each occurrence" limit instead of claimed separately and measured against the "each person" limit.

An appropriate order will be entered contemporaneously with this opinion.

Date:  December 22, 2014                          BY THE COURT:


                                                 /s/ *Joy Flowers Conti*
                                                 Joy Flowers Conti
                                                 Chief United States District Judge